CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ANNE O'TOOLE (Bar No. 340469)
(E-Mail: annie_otoole@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
NICOLE GUIU

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. CR 23-00023-FMO |
|---|---|
| Plaintiff, | **NICOLE GUIU'S POSITION REGARDING SENTENCING FACTORS** |
| v. | |
| NICOLE GUIU, | |
| Defendant. | |

Defendant Nicole Guiu, by and through her counsel of record, Deputy Federal Public Defender Anne O'Toole, hereby files her position regarding sentencing and exhibits.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: January 12, 2024    By  /s/ Anne O'Toole
ANNE O'TOOLE
Deputy Federal Public Defender
Attorney for NICOLE GUIU

## **TABLE OF CONTENTS**

|   |   | Page |
|---|---|---|
| I. INTRODUCTION | | 1 |
| II. SENTENCING CONSIDERATIONS | | 1 |
| | A. Ms. Guiu's childhood was characterized by abuse, dismissal, and abandonment. | 1 |
| | B. Ms. Guiu's ex-husband created an environment of constant abuse, fear, and humiliation for Ms. Guiu and her family that mirrored her childhood environment. | 3 |
| | C. Ms. Guiu committed this crime during the lowest point of her life while in dire financial straits. | 4 |
| | D. Ms. Guiu has found a way, since separating from her ex-husband, to lead a healthy, law-abiding, and productive life. | 6 |
| III. OBJECTIONS AND CORRECTIONS TO PRESENTENCE REPORT | | 7 |
| | A. The sophisticated means enhancement should not apply. | 7 |
| | B. The criminal history category should be I, not II. | 8 |
| | C. Ms. Guiu's guidelines range should be 27 to 33 months. | 8 |
| | D. The defense requests a few corrections to the PSR's factual information. | 9 |
| IV. CONCLUSION | | 10 |

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*United States v. Horob*,
  735 F.3d 866 (9th Cir. 2013) ................................................................................. 8

*United States v. Jennings*,
  711 F.3d 1144 (2013) ............................................................................................ 8

*United States v. McLaughlin*,
  203 Fed. Appx. 891 (9th Cir. 2006) (unpublished) .............................................. 8

**Federal Statutes**

USSG § 2B1.1 ................................................................................................................ 7

USSG § 4A1.1 ................................................................................................................ 8

## I. INTRODUCTION

It has been seven years since Ms. Guiu diverted funds from her employer to her personal bank account. During the time period that she committed this crime, Ms. Guiu was carrying an enormous financial burden for a family of five and her self-esteem had been stripped away by her ex-husband's psychological and physical abuse, which mirrored her father's treatment when she was a child. But over the past seven years since then, Ms. Guiu has completely turned her life around. She ended her physically and emotionally abusive marriage. She pulled her family out of the financial hole that her ex-husband dug for them. She has been caring for her aging mother, adult children, and grandchild. And she has been in therapy to heal from the trauma of her relationships and learn how to make better choices when she encounters personal challenges in the future. Ms. Guiu has also fully accepted responsibility for the crime she committed and is prepared to make a lump payment of $5,000 at the time of sentencing in an effort to jumpstart paying down her expected restitution.

This turnaround is a remarkable demonstration of Ms. Guiu's strength of character, perseverance, and commitment to living a law-abiding life. We do not have to wonder if Ms. Guiu is someone who would be able to acclimate back to society as a lawful citizen, for she has already demonstrated that she is fully capable of doing so. A noncustodial sentence of a term of supervised release is sufficient, but not greater than necessary, to achieve the purposes of sentencing here.

## II. SENTENCING CONSIDERATIONS

### A. Ms. Guiu's childhood was characterized by abuse, dismissal, and abandonment.

Ms. Guiu's upbringing exposed her to significant trauma from a very early age. As a child, she regularly witnessed her father's abuse of her mother. PSR ¶ 52. Twelve years older than her mother, her father was extremely controlling and had a temper when he perceived any insubordination from his wife or daughter. *See id*. He would often come home drunk and push Ms. Guiu's mother, hold her down, and hit her. *Id*.

1

As a young girl, Ms. Guiu learned that she too should fear her father. When Ms. Guiu was just five years old, her father came home in a drunken stupor, knocking on the windows to Ms. Guiu's room, which had an entrance to the exterior of the house. *See id*. The way in which he tried to get into his five-year-old daughter's room led Ms. Guiu's mother to believe that he was trying to sexually abuse Ms. Guiu. *See id*. Ms. Guiu's mother, fearing for their safety, took Ms. Guiu and secretly left the house. *Id*. They returned the next morning to discover that the house had been emptied, utilities had been shut off, and Ms. Guiu's father had left. *Id*. He left a short, spiteful note telling Ms. Guiu and her mother that they were on their own. *See id*.

Ms. Guiu thus grew up with deep confusion and unjustified shame about her father's sudden abandonment. And while he still had partial custody over Ms. Guiu, when Ms. Guiu visited him on the weekends, he often simply left Ms. Guiu, still a child, in the house alone while he went out with his new girlfriend. *Id.* ¶ 53. As Ms. Guiu grew older and more independent, her father jockeyed to establish his power over her. He refused to let Ms. Guiu leave his home, even when he left her there for long stretches of time on her own. When he found out that Ms. Guiu left and went to a friend's house, he tracked her down, made a scene, and forcefully pulled her out, only to leave her at his house alone once more. *See id*. Unsurprisingly, this exacerbated Ms. Guiu's low self-esteem. When Ms. Guiu was in junior high, her father cut off contact with her entirely after another angry bout concerning Ms. Guiu's choice of friends. *Id*.

As a result of this chaotic upbringing, feelings of shame and responsibility for her lot in life have weighed on Ms. Guiu throughout her life. Though she was just a child who was still learning and developing, Ms. Guiu blamed herself for her father's desertion of his family. She felt that she needed to be perfect in order to avoid further disappointment and abandonment from others in her life. When she learned at just sixteen years old that she was pregnant with twins, the feelings of responsibility piled on. She gave birth to two healthy children, a boy and a girl, and subsequently had a third child, a boy, just a few years later. *See id*. ¶ 55. The children's father quickly fell

into a life of substance abuse and was only intermittently present in their lives, offering no financial or childcare support. Ms. Guiu thus felt great and immediate pressure to start a successful career to take care of her children.

### B. Ms. Guiu's ex-husband created an environment of constant abuse, fear, and humiliation for Ms. Guiu and her family that mirrored her childhood environment.

A few years after giving birth to her youngest child, Ms. Guiu met and began dating Mekiael Hill, whom she ultimately married. *See id*. ¶ 56. Instead of providing a supportive partnership that might ease Ms. Guiu's responsibilities, Mekiael exploited Ms. Guiu's tendency to give and provide for others above herself. He latched onto Ms. Guiu and drained her of confidence and financial resources. Early on in their relationship, Mekaiel demanded that Ms. Guiu move from her home in California to Virginia to be closer to his own daughter, isolating Ms. Guiu from her family and friends. *Id*. But once they moved, the family discovered that Mekiael was unable to hold down a job. Throughout their entire relationship, Mekiael was fired constantly from various jobs for absences and getting into violent altercations with customers and employees. *Id*. For example, when the couple eventually returned back to California, Ms. Guiu helped find Mekiael a security job at the prestigious Roosevelt Hotel, but Mekiael was fired from that job after assaulting a customer.

Things grew worse instead of better when the family returned to California. Mekiael was an alcoholic who often drank to the point of passing out at home. Despite failing to keep a job himself, he took Ms. Guiu's money to spend on alcohol and hotel rooms so that he could cheat on Ms. Guiu with other women. *See id*. ¶ 57. He flaunted his partying and infidelity, such that Ms. Guiu's children would catch him drinking and sleeping with other women in the house while Ms. Guiu was at work. *See id*.

Mekiael also grew more and more abusive to Ms. Guiu and her children. He brutally beat the children with planks, belts, and other objects for minor transgressions, often causing lasting injuries. *See id*. ¶ 58. In addition to this extreme physical abuse,

Mekiael also viciously tore down the children psychologically, constantly attacking their self-esteem, making degrading comments about their appearances, and throwing out supplies and awards from their activities because of his spiteful view that the children were undeserving of any accolades. On one occasion, Mekiael attacked one of Ms. Guiu's sons, for eating a cookie at breakfast, so viciously that the boy urinated on himself, and was unable to sit in a chair because of his injuries. *Id.* As a result, all of Ms. Guiu's children grew up in constant fear of Mekiael. And despite Mekiael being the only male guardian in their lives from a very young age, none of Ms. Guiu's children considered him to be any kind of father at all.

On the other hand, Ms. Guiu did everything in her power to maintain as normal a life as possible for her children. When she was not at work, she frequently intervened during Mekiael's beatings. This always led to retaliation, with Mekiael screaming insults and throwing Ms. Guiu against the wall. With Ms. Guiu, Mekiael's abuse was often about control and psychological domination—a dynamic that was familiar to Ms. Guiu after living under her father's demanding hand. Mekiael constantly degraded her appearance and exploded when Ms. Guiu would not follow his commands. Ms. Guiu went through every day tiptoeing around her husband, in fear that he would flip like a switch. Despite Mekiael providing close to nothing for the family, Ms. Guiu cooked for him and succumbed to his demands for money that he spent on expensive sneakers, alcohol, and strip clubs. Once, during a particularly terrifying altercation, Ms. Guiu attempted to run away from home barefoot in fear. Mekiael grabbed her, tied her up, and locked her in the garage for four hours against her crying pleas. *See id.* ¶ 57.

**C.   Ms. Guiu committed this crime during the lowest point of her life while in dire financial straits.**

Mekail's abuse of Ms. Guiu and her children took place against the backdrop of significant financial stressors. From a very young age, one of Ms. Guiu's son was diagnosed with severe ADHD, *see id.* ¶ 55, which required special education teachers and resources, as well as unpredictable time off from work to handle incidents at

school. Two years before Ms. Guiu started working at the Monrovia Courtyard, saddled with debt and childcare expenses, she filed for bankruptcy with the hopes of starting afresh. *See* Docket No. 6:08-BK-19836-MJ. Shortly after, her car was repossessed for failure to make a mortgage payment, on which she eventually defaulted because she was overleveraged on her home. Without even enough money to pay rent, the family had to move in with Ms. Guiu's mother in Montclair.

Ms. Guiu thus took on a life of caring for three children, including one with special needs, an abusive and demanding husband, as well as her aging mother. Trying to keep everyone afloat, Ms. Guiu began to divert funds from her employer to cover the gaps in her finances. Though the government claims that the loss amount added up to over $400,000 over seven years (from 2010 to 2017), the funds did not result in any lavish gains for Ms. Guiu or her children. With Mekiael constantly running up Ms. Guiu's cards and not contributing to the household, Ms. Guiu still struggled to pay her children's expenses. Ms. Guiu frequently had to pull her children out of sports and other activities, unable to afford the equipment and fees. And when her daughter graduated from high school in 2013 and enrolled at Washington State University, she was forced to drop out just two semesters later when Ms. Guiu was unable to continue paying tuition. These opportunities were particularly important for the children, who did not feel secure at home under Mekiael's watch and thus sought to spend as much time outside the home as possible.

Despite all of these challenges and the monumental error in judgment she made by committing this crime, Ms. Guiu was always a remarkable, resilient mother and role model for her children. All three grew up into healthy adults who have gone on to lead successful lives and careers, for which they fully credit Ms. Guiu's support and guidance. There is no doubt that Ms. Guiu went above and beyond the responsibility of a single parent.

**D.     Ms. Guiu has found a way, since separating from her ex-husband, to lead a healthy, law-abiding, and productive life.**

Today, Ms. Guiu is deeply remorseful for her criminal conduct. She knows that financial destitution is not an excuse to commit a crime and she is profoundly sorry for the harm she caused her former employer and for breaking the law. Actions speak louder than words, and Ms. Guiu's lawful, productive, and prosocial behavior of the past seven years demonstrate a real commitment to change that is unique among many of the defendants who appear before the Court.

Losing her job at the Courtyard Marriott was the wake-up call that Ms. Guiu needed to separate from her abusive ex-husband, re-devote herself to hard work, and find the strength to dig herself and her family out of their deep financial hole, this time while abiding by the law. Once out from under the influence of her ex-husband, Ms. Guiu again became the fighter she has always considered herself to be, setting her life back on track and supporting her family. Ms. Guiu's adult son, adult daughter, and granddaughter live in the same home as Ms. Guiu. *See id.* ¶ 59. Ms. Guiu helps support her children as they complete school and training for their chosen professions as a nurse and a pilot. Ms. Guiu also helps look after and financially provide for her granddaughter. And as her mother gets older, Ms. Guiu feels an increased urgency to provide oversight of her care, since her mother lives alone in Hawaii and has recently suffered from memory loss and several falls.

Since 2022, Ms. Guiu has been working through her trauma and resulting PTSD, depression, and anxiety with a therapist and is finding it incredibly beneficial. Through therapy, she has learned that she cannot properly care for others while subordinating her own needs. In addition to prioritizing her own mental and physical health, she has learned strategies for resetting and taking healthy steps forward when presented with circumstances that initially appear to have no way out. This self-work will be instrumental to ensuring that Ms. Guiu never commits a crime again and will help her live a productive and balanced life.

A noncustodial sentence would allow Ms. Guiu to continue this progress, subject to Court supervision to ensure that she stays on the path she has set for herself. Ms. Guiu has complied with all Court ordered conditions of pretrial release already, *see id.* ¶ 4, and there is every reason to believe that she would continue to do well under supervision. A custodial sentence, by contrast, would set Ms. Guiu back from the progress she has made over the past seven years and would make it more difficult for her to find the productive and balanced life she envisions for her future. She would lose her job, her financial difficulties would mount, and she would lose the ability to care for her mother and to be there for her children and her granddaughter. These outcomes are avoidable here, since Ms. Guiu is not at risk of recidivating, as is clear from her spotless record in the seven intervening years since she committed this crime. Accordingly, Ms. Guiu respectfully requests that the Court sentence her to a period of supervised release.

### III. OBJECTIONS AND CORRECTIONS TO PRESENTENCE REPORT

**A.   The sophisticated means enhancement should not apply.**

The PSR applied the "sophisticated means" enhancement on the basis that Ms. Guiu "created a fraudulent login for Marriott employee D.F. for Marriott's POS system which allowed Guiu hide transactions, specifically it allowed her to issue herself refunds without detection." PSR ¶¶ 26-27; USSG § 2B1.1(b)(10)(C). Application Note 9, however, explains that this enhancement is appropriate only where the crime is accomplished through "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Examples of sophisticated means include "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.*

From the text of the guidelines and the commentary, it is clear that the sophisticated means enhancement should not apply here. Ms. Guiu's conduct was no different than many other fraud schemes. She took funds from her employer that did not belong to her by issuing fraudulent reimbursements to herself. There is nothing

7

particularly sophisticated about how she reimbursed herself, even if she used a login she created for a colleague, and so the enhancement should not apply. *See, e.g.*, *United States v. McLaughlin*, 203 Fed. Appx. 891, 893 (9th Cir. 2006) (unpublished) ("Although the PSR stated that [defendant] deposited client funds into a separate, private account in her name and that she lied to her law-firm partners about the status of cases, these facts alone do not indicate that her concealment was carried out in a particularly sophisticated manner."). When this enhancement is added, it is in cases involving far more sophisticated schemes, such as where shell companies are created and then used to facilitate fraud. *See United States v. Jennings*, 711 F.3d 1144, 1146 (2013) (creation of shell company and fake bank account to disguise payments to defendants as legitimate expenses "was 'more complex' than found in a typical tax fraud case" and thus justified the enhancement); *see also United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) (noting that this enhancement requires scheme to be "'especially complex or especially intricate,' compared to the usual fraud offense").

**B.     The criminal history category should be I, not II.**

The 2023 amendments to the United States Sentencing Guidelines changed § 4A1.1(d) so that a person will only receive additional criminal history points for committing an offense while on probation, parole, or supervised release if they have seven or more criminal history points.

Ms. Guiu only had one criminal history point, without the two-point increase. PSR ¶ 42. Under the new Guidelines, Ms. Guiu should not receive a two-point increase for being on supervised probation when she committed the instant offense. Accordingly, Ms. Guiu's total criminal history score should be 1 and her criminal history category should be category I rather than category II.

**C.     Ms. Guiu's guidelines range should be 27 to 33 months.**

Without the sophisticated means enhancement, Ms. Guiu's total offense level should be 18. At a criminal history category I, Ms. Guiu's guidelines range should be 27 to 33 months. *Id.* ¶ 88.

8

**D.     The defense requests a few corrections to the PSR's factual information.**

Paragraph 50

Ms. Guiu's father passed away in December 2023. Although Ms. Guiu was not in contact with her father at the time that he died, she had previously reconnected with him in adulthood when her children were older, so that Ms. Guiu could better understand herself and so that her children could choose to have a relationship with their grandfather if they wished.

Paragraph 59

Ms. Guiu's former roommate Gee Cortez no longer lives in the home she shares with her children and granddaughter.

Paragraphs 61-62

Ms. Guiu's prescription medications have changed slightly since her presentence interview. She is currently prescribed 40 milligrams of lisinopril and 40 milligrams of fluoxetine. The rest of her prescription medications remain the same as listed in the PSR.

Paragraph 73

Ms. Guiu is providing updated information regarding her current finances to the probation office for inclusion in an addendum to the PSR.

Paragraph 83

Ms. Guiu's income is not inflated by her daughter's contributions and the mortgage has been paid monthly since April 2023. Ms. Guiu's daughter regularly contributes rent, utilities, and sometimes other expenses to the shared household, which may vary depending on the monthly expenses for the members of the household individually and together. Ms. Guiu has maintained on-time payments of the mortgage to the home where she resides, including since April 2023. Ms. Guiu's daughter's rent payments contribute to the mortgage. The home belongs to Ms. Guiu's mother; Ms. Guiu sometimes pays the mortgage directly and sometimes pays her mother, who then

pays the mortgage. Ms. Guiu is providing to the probation office updated bank statements and an updated mortgage statement showing no outstanding balance.

## IV. CONCLUSION

For the reasons stated, Ms. Guiu respectfully requests that the Court impose a sentence of supervised release.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: January 12, 2024  By  */s/ Anne O'Toole*
ANNE O'TOOLE
Deputy Federal Public Defender
Attorney for NICOLE GUIU